CHARLES SCHNEIDER & CO., INC., an Iowa Corporation, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Charles Schneider & Co. v. Commissioner
Docket Nos. 7740-70, 7741-70, 7743-70, 7744-70, 7745-70
United States Tax Court
T.C. Memo 1973-130; 1973 Tax Ct. Memo LEXIS 156; 32 T.C.M. (CCH) 555; T.C.M. (RIA) 73130; June 18, 1973, Filed *156 1. Based on all the facts presented, compensation paid by the petitioners to certain officers was unreasonable and excessive. Held: Reasonable compensation determined. 2. Petitioner Future Foam, a corporation, purchased stock in a corporation which it hoped would serve as a distributor for its inventory. Future Foam later sold the stock without gain or loss but evidenced by a note. Several years after the sale, and without any payment, the note became worthless. Held: Future Foam is entitled to an ordinary bad debt loss pursuant to section 166(a). 3. Charles, Inc. and its wholly owned subsidiary Chemical Corporation of America filed a consolidated return for the fiscal year ended June 30, 1968. The outstanding stock of Charles, Inc. was held entirely by Future Foam. Held: Charles, Inc. and Chemical Corporation of America were not privileged to file a consolidated return since Future Foam, a member of the affiliated group and parent corporation to Charles, Inc., did not join in such consolidation as required by section 1504(a) and section 1.1502-76(b) (1), Income Tax Regs.
Truman Clare and R. David Garber, for the petitioners. Ronald M. Frykberg, for the respondent. 2 *157 STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The Commissioner determined deficiencies in the petitioners' Federal income tax as follows: Petitioner
Docket No.
Fiscal Year
Deficiency Charles Schneider & Co., Inc.
7740-70
6/30/66
$31,396.22
6/30/67
23,157.41
6/30/68
29,178.81
Future Foam, Inc.
7741-70
8/31/66
34,930.17
8/31/67
5,874.46
8/31/68
22,725.58
Charles, Inc.
7743-70
6/30/67
1,864.38
7744-70
6/30/68
11,664.58
Central Woodworking Co., Inc.
7745-70
6/30/66
492.80
6/30/67
172.82
6/30/68
344.77 Concessions have been made by the parties leaving the following three issues for our consideration: (1) Whether the respondent erred in determining that certain deductions, claimed on the income tax returns of Charles Schneider & Co., Future Foam, Inc., and Central Woodworking Co., Inc., for compensation of its executive officers, were unreasonable and excessive. (2) Whether Future Foam, Inc. is entitled to a business bad debt deduction, pursuant to section 166, of $30,000 upon the worthlessness of a note issued to Future Foam, Inc. in exchange for stock. (3) Whether Charles, Inc. and its wholly owned subsidiary Chemical Corporation were privileged to file a consolidated return for the fiscal year ended *158 June 30, 1968, without Future Foam, Inc., Charles, Inc.'s parent. 3 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Charles Schneider & Co., Inc. (hereinafter C.S. & Co.) is a corporation organized under the laws of Iowa with its principal office at Council Bluffs, Iowa. C.S. & Co. filed its Federal corporate income tax returns for the fiscal years ended June 30, 1966, June 30, 1967 and June 30, 1968 with the district director of internal revenue at Des Moines, Iowa. Petitioner, Central Woodworking Co., Inc. (hereinafter Central) is a corporation organized under the laws of Iowa with its principal office at Council Bluffs, Iowa. Central filed its Federal corporate income tax returns for the fiscal years ended June 30, 1966, June 30, 1967 and June 30, 1968 with the district director of internal revenue at Des Moines, Iowa. Petitioner Future Foam, Inc. (hereinafter Future Foam) is a corporation organized under the laws of Nebraska with its principal office at Council Bluffs, Iowa. Future Foam filed its Federal corporate income tax returns for *159 the fiscal years ended August 31, 1966, August 31, 1967, and August 31, 1968 with the district director of internal revenue at Des Moines, Iowa. 4 Petitioner Charles, Inc. is a corporation organized under the laws of Iowa with its principal office at Council Bluffs, Iowa. Charles, Inc. filed its Federal corporate income tax returns for the fiscal years ended June 30, 1967 and June 30, 1968 with the district director of internal revenue at Des Moines, Iowa. Charles, Inc. filed an amended return for the fiscal year ended June 30, 1968 with the district director of internal revenue at Kansas City, Missouri. Charles Schneider (hereinafter referred to as Schneider) was born in 1916. He had attended law school and completed all of his law school training, except pleading and practice, when he was called into military service during World War II. In 1946 Schneider started a furniture upholstering business in Omaha, Nebraska. Some 19 or 20 years later Schneider's business was moved to Council Bluffs, Iowa. On January 1, 1954, Schneider transferred the assets and liabilities of his proprietorship, which had been doing business as Charles Schneider and Company, to the petitioner, *160 C.S. & Co., in exchange for its capital stock of $31,160.15. Schneider has owned all the issued and outstanding capital stock of C.S. & Co. since its incorporation. During the period from January 1, 1954 to June 30, 1963, Schneider was the president of C.S. & Co. and Leon Summer (hereinafter Summer) was the vice-president. Since July 1, 5 1963, Summer has been president. During all the years in issue, Schneider has been vice-president, treasurer, and chairman of the board of directors. Summer, who was born in 1925, is a brother-in-law of Schneider. Summer, a Phi Beta Kappa graduate of the City College of New York, worked for C.S. & Co. for about 6 months during 1948. He then returned to New York for a period of time to do graduate work in economics at Columbia University. After incorporation and through June 1958, Schneider, Summer and Rebecca Schneider, Schneider's mother, comprised the board of directors of C.S. & Co. From July 1958 to the date of trial the board of directors has been composed of Schneider, Summer and Truman Clare, the company's attorney. Prior to 1954, Schneider and Summer founded a copartnership known as Central Woodworking Company. On January 1, 1954, *161 Schneider and Summer transferred the assets and liabilities of their copartnership to Central in exchange for its capital stock of $25,000. Schneider and Summer have each owned 50 percent of Central's outstanding stock since its incorporation. Throughout its life Central has been principally engaged in the manufacture of wooden furniture frames. The bulk of Central's sales were to C.S. & Co. and Charles, Inc. From Central's inception as a corporation through 1968, Summer was president and Schneider was vice-president. Following 6 incorporation through June, 1958, Schneider, Summer and Rebecca Schneider comprised the board of directors of Central. Since July, 1958, Schneider, Summer and Truman Clare have been the board members. Charles Jobbing Company, Inc. was organized during September, 1958. Ten shares of the company's stock, par value $100 each, were issued to Schneider. On May 31, 1960 Charles Jobbing Company, Inc. changed its name to Future Foam. From incorporation through July 1, 1963, the board of directors consisted of Schneider, Summer and Truman Clare. During this same period Schneider held the office of president, and Summer was vice-president. During the period *162 from September, 1958 to July 1, 1963, Future Foam was doing business both under the name Charles Jobbing, as a wholesale jobber of fabrics, materials, and foam products, and under the name Chairs, Unlimited, as a manufacture of chairs under a subcontracting arrangement with C.S. & Co. Sol Friedman (hereinafter Friedman) was born September 26, 1935. He began working for C.S. & Co. in late 1958 or early 1959 on a part-time basis while attending the University of Omaha. Upon graduation in 1959 with a bachelor of science degree in business administration he began full-time employment 7 with C.S. & Co. Friedman and Schneider are related through marriage. During 1960 Friedman became an employee of Future Foam. Bill Grassman was born on January 3, 1933. He began working with the Future Foam Division of C.S. & Co. on a part-time basis while attending the University of Omaha. Upon graduation from college as a chemistry major in June, 1958, he went to work on a full-time basis with the Future Foam Division of C.S. & Co. While attending the University of Omaha and thereafter while employed by C.S. & Co. Grassman began working with Schneider and Dr. G. N. Marquardt of the University *163 of Omaha Chemistry department to develop a polyurethane foam production process for use in making a cushioning material for upholstered furniture. Together they were able to develop a continuous production of polyurethane foam, a process which eluded many other companies' manufacturing polyurethane foam and which was more economical than prior methods. On June 30, 1963, the Future Foam Division of C.S. & Co. was transferred to Future Foam. In connection therewith Future Foam received the following: 8 Cash
$6,080.25
Accounts Receivable
211,944.71
Machinery & Equipment - Net
23,949.26
Inventories
31,774.20
Accounts Payable
$252,293.96
Accrued Taxes
1,903.49
Retained Earnings
19,550.07
$273,748.42
$273,748.42
Thereafter Future Foam commenced operations as a manufacturer of polyurethane foam products. Friedman became the president of Future Foam on July 1, 1963, and has held that office since that date. Grassman became an employee of Future Foam on July 1, 1963, and has been vice-president of the company since then. The board of directors since July 1, 1963 has been composed of Friedman, Grassman, and Schneider. Charles, Inc. was incorporated on July 1, 1963. On the same day Future Foam, in an *164 exchange for stock, spun off its Charles Jobbing and Chairs Unlimited operations to Charles, Inc., transferring the following to Charles, Inc. Fixed Assets - Net
$930.10
Accounts Receivable
35,956.76
Cash
609.82
Total Assets
$37,496.68
Liabilities Assumed by Charles, Inc.:
Iowa Witholding Taxes
$68.34
Payroll Taxes
2,208.57
Accrued Expenses
2,256.14
4,533.05
$32,963.63 9 In the exchange Future Foam received the entire outstanding capital stock of Charles, Inc. in the amount of $32,963.63, which Future Foam has owned since that time. The president of Charles, Inc. since its incorporation has been Schneider. The board of directors through 1968 had been comprised of Schneider, Summer and Friedman. On July 1, 1963, Schneider and Summer entered into written salary agreements with C.S. & Co. covering July 1, 1963 through June 30, 1968. The agreements provided that Schneider would receive a salary of $230 per week and that Summer would receive $351 per week. The agreements also provided for certain bonuses to be paid to Schneider and Summer. Though not spelled out in the agreements, the parties understood that the bonuses would be computed as follows: Bonus No. 1. If there was sufficient net income *165 Three-fourths of 1% of annual net sales divided equally between Schneider and Summer. Bonus No. 2. After deductions from net profits for: (a) Schneider's and Summer's salaries and No. 1 bonuses. (b) 2% of net sales for retained earnings; (c) federal income taxes; (d) state income taxes; remainder to be divided equally between Schneider and Summer. 10 Schneider's agreement provided that his total compensation from C.S. & Co. could not exceed $65,000. Summer's agreement contained a stock option giving him the right to purchase up to 20 percent of C.S. & Co. stock. Summer failed to exercise this option. The following table shows the compensation paid by C.S. & Co. to Schneider and Summer during the years in issue (not including deferred compensation): 6/30/66
Salary
Bonus #1
Bonus #2
Total Schneider
$12,000.04
$4,876.84
$48,228.06
$65,104.94
Summer
19,305.00
4,876.84
50,232.66
74,414.50
6/30/67
Schneider
1 2,000.04
5,949.63
41,103.31
59,052.98
Summer
19,305.00
5,949.63
41,103.32
66,357 .95
6/30/68
Schneider
12,000.04
8,367.19
44,632.77
65,000.00
Summer
19,305.00
8,367.19
46,417.17
74,089.36
The following table shows pertinent figures from C.S. & The following table shows pertinent figures from C.S. & Co.'s income *166 tax returns for the years ended June 30, 1954 through June 30, 1968 (figures rounded off to nearest dollar): 11 Officers' Salaries Direct
Year Ending
Gross Gross Profit
Net Profit
Charles Leon Other
Receipts
Before
Schneider
Summer
Officers'
Salaries &
Fed. Inc. Tax
6/30/54
$320,107
$50,871
$16,779
$6,000
$5,000
6/30/55
836,476
137,141
28,488
12,000
10,000
6/30/56
949,384
174,793
45,112
12,791
11,520
6/30/57
863,533
172,308
38,486
12,701
11,769
6/30/58
1,269,777
284,017
75,171
25,285
13,984
6/30/59
1,977,683
439,178
88,001
40,470
17,391
6/30/60
2,428,921
548,517
88,100
44,059
19,556
6/30/61
2,599,173
537,532
105,893
43,357
18,571
6/30/62
2,675,104
549,122
78,622
42,612
18,603
6/30/63
2,546,219
398,376
63,537
43,416
18,954
6/30/64
1,009,255
260,071
43,215
14,570
21,083
6/30/65
1,110,292
351,118
96,528
31,496
38,329
6/30/66
1,300,490
455,382
182,466
65,105
74,414
23,229
6/30/67
1,586,567
548,967
206,716
59,053
66,358
34,469
6/30/68
2,231,249
725,240
254,658
65,000
74,089
31,860
Officers'Salaries - Direct
Year
Total
Taxable
Federal
Net Profit
Total Assets
Earned Surplus
Ending
Income
Income
After
Book Value
Year End
6/30/54
$11,000
$5,779
$1,734
$4,045
$113,107
$4,045
6/30/55
22,000
6,488
1,946
4,541
124,630
8,587
6/30/56
24,312
20,800
6,240
14,560
134,927
23,147
6/30/57
24,470
14,015
4,205
9,811
159,138
32,958
6/30/58
39,269
35,902
13,169
22,733
217,935
55,691
6/30/59
57,861
30,140
10,533
19,607
375,058
75,298
6/30/60
63,616
24,485
7,345
17,139
497,829
89,280
6/30/61
61,928
43,964
17,361
26,603
456,088
112,726
6/30/62
61,215
17,407
5,222
12,185
511,328
121,754
6/30/63
62,370
1,167
350
817
592,827
119,414
6/30/64
35,654
7,561
1,733
5,829
378,512
102,008
6/30/65
69,825
26,704
7,835
18,869
340,026
134,225
6/30/66
162,748
9,717
5,002
14,715
363,099
148,558
6/30/67
159,880
46,835
15,834
31,001
476,353
180,079
6/30/68
170,950
83,708
36,996
46,712
686,586
225,548
*167 12 Among the heading "Officers' Salaries - Others" in the above chart were the following: Year
Officer
Compensation 6/30/66
Robert Conger
$13,460.00
Raymond Trumble
9,769.01
6/30/67
Robert Conger
21,350.00
Raymond Trumble
13,119.26
6/30/68
Robert Conger
28,690.00
E. Tinley, III
3,170.19 C.S. & Co. returns for the years ended June 30, 1960 through June 30, 1968 indicate the company had the following number of employees at the end of each year: Year
Number of Employees 6/30/60
124
6/30/61
159
6/30/62
152
6/30/63
132
6/30/64
73
6/30/65
74
6/30/66
76
6/30/67
76
6/30/68
114
Prior to July 1963 Schneider and Summer, as president and vice-president, respectively, were the only officers actively involved with the management of C.S. and Co. Following July 1, 1963 and throughout the years in issue, Schneider was chief executive of Charles, Inc. and was less directly involved with the operations of C.S. & Co. The management team of C.S. & Co. during the years after July 1, 1963, was composed of Summer as president, Robert Conger, 13 Joseph Inzaurro, Daniel Maschka, and Raymond Trumble. Conger, vice-president from 1966 forward, was a key man involved in many facets of C.S. & Co.'s operations. Schneider's involvement was limited *168 to creation of an atmosphere which would foster self-motivation of C.S. & Co.'s management team. Schneider was remarkably successful in this and thus played an important role in C.S. & Co.'s success. Conger, Inzaurro, Maschka and Trumble were provided bonuses which were determined without relation to any set formula at year's end. C.S. & Co. has not paid any dividends since its incorporation. On July 1, 1963, Schneider, Friedman and Grassman entered into written salary agreements with Future Foam, which were in effect throughout the years in issue. Schneider's base salary was $150 per week. Friedman and Grassman were to receive $175 each. In addition the agreements provided for certain bonuses to be paid the three of them, computed as follows: Bonus No. 1. If there was sufficient net income three-fourths of 1% of annual net sales divided equally between Friedman and Grassman. 14 Bonus No. 2. After deductions from net profits for: (a) salaries to Schneider, Friedman and Grassman and the number 1 bonus; (b) 2% of net sales for retained earnings; (c) federal income taxes; (d) state income taxes; remainder to be divided equally between Schneider, Friedman and Grassman. Schneider's *169 agreement provided that his total annual compensation would not exceed $65,000. Friedman's and Grassman's agreements contained provisions for each of them to purchase up to 20 percent of Future Foam. The agreements also provided that Friedman and Grassman would have no interest in Future Foam's stock investment in its wholly owned subsidiary, Charles, Inc., but that the net stockholder's equity in Charles, Inc. would accrue to Schneider. Concurrently with the stock option grant, on July 1, 1963, Schneider, Friedman and Grassman entered into an agreement providing that upon the death of Friedman or Grassman, or their desire to sell or transfer their stock, the remaining shareholders would have first option to acquire the stock. Between February 15, 1965 and August 31, 1965, Friedman and Grassman exercised their options. Throughout the years in issue of the total outstanding shares of Future Foam, Schneider owned 60 percent and Friedman and Grassman each owned 20 percent. 15 At a special meeting of the board of directors of Future Foam held on November 5, 1965, Schneider's maximum salary was reduced to $45,000 per year, for the fiscal year beginning September 1, 1965. The following *170 amounts were paid to Schneider, Friedman and Grassman for the fiscal year ended August 31, 1966: Salary
Bonus #1
Bonus #2
Total Friedman
$13,520
4,849
$61,807
$80,176
Grassman
13,520
4,849
61,807
80,176
Schneider
7,800
37,200
45,000 Had there not been a $45,000 limitation on Schneider's salary, he would have received $69,607 from Future Foam for the fiscal year ended August 31, 1966. However, the $24,606 excess was paid to Schneider during the following fiscal year, giving Schneider a total salary of $45,780 for the fiscal year ended August 31, 1967. The following table shows pertinent figures from Future Foam's income tax returns for the years ended August 31, 1959 through August 31, 1968 (rounded off to nearest dollar): 16 Officers' Salaries - Direct
[3]
Year
Gross
Gross
Net Profit Charles Leon Sol
William Ending
Receipts
Profit
Before
Schneider
Summer
Friedman
Grassman
Officers'
Salaries
& Fed.
Inc. Tax
8/31/59
$111,433
22,743
$19,698
$5,572
$2,786
8/31/60
290,307
125,085
34,693
10,312
5,156
8/31/61
553,357
136,080
34,445
10,080
5,040
8/31/62
858,354
140,305
20,875
10,600
5,300
8/31/63
1,202,313
79,726
15,771
10,275
3,000
8/31/64
903,520
164,493
74,529
6,023
21,512
21,512
8/31/65
1,209,983
366,429
238,017
60,117
70,399
70,399
8/31/66
1,293,131
386,476
265,995
45,000
80,176
80,176
8/31/67
1,328,123
303,476
125,883
45,780
31,874
31,874
8/31/68
1,610,338
380,351
132,064
19,086
30,845
30,845
*171 Officers' Salaries - Direct
[3]
Year
Total
Taxable
Federal
Net Profit
Total Asset
Earned Surplus
Ending
Income
Income
After
Book Value
Year End
Taxes
Officers'
Year End
Salaries
& Fed.
Inc. Tax
8/31/59
$8,357
$11,341
$3,402
$7,939
$ 23,983
7,939
8/31/60
15,468
19,225
5,768
13,458
110,821
21,396
8/31/61
15,120
19,325
5,798
13,528
112,066
32,453
8/31/62
15,900
4,975
1,493
3,482
165,894
33,905
8/31/63
13,275
2,496
749
1,748
289,769
51,143
8/31/64
49,047
25,482
7,411
18,071
262,483
54,584
8/31/65
200,916
37,101
12,798
24,303
391,387
78,507
8/31/66
205,352
60,643
23,756
36,887
457,620
114,195
8/31/67
109,528
16,355
4,519
11,836
458,222
125,348
8/31/68
80,776
51,288
20,681
30,607
455,237
155,959 17 The number of Future Foam employees at the end of each fiscal year ranged between 14 and 28 employees. Future Foam's customers included C.S. & Co. and Charles, Inc. However, Future Foam sold foam to many other furniture manufacturers and C.S. & Co. and Charles, Inc. purchased foam from other producers. *172 Friedman was primarily involved with sales and administration within Future Foam. Grassman was charged with the production of the foam. Schneider was involved with company policy, corporate goals, and the development of Friedman and Grassman as a "self-motivated" management team. Future Foam has not paid any dividends since its incorporation. Schneider and Summer have each owned 50 percent of Central's stock since its incorporation on January 1, 1954. During the years ended June 30, 1960 through June 30, 1963, Summer, as president and Schneider as vice-president were each paid $8,060. During the years ended June 30, 1964 through June 30, 1966, each received $7,440. During the years ended June 30, 1967 and June 30, 1968, each received $5,340 and $2,400 respectively. Central has not paid any dividends since its incorporation. 18 Charles, Inc. is a manufacturer of upholstered furniture doing business in direct competition with C.S. & Co. Charles, Inc.'s reputation in the industry as a furniture manufacturer was equal to that of C.S. & Co. Some of Charles, Inc.'s line of furniture, while of the same general type, is slightly higher priced. Schneider was the chief executive officer *173 of Charles, Inc. during the years 1963 through 1968. During that time he was actively involved with the management and operations of the company.Again Schneider was interested in developing a strong self-motivated management team. Prior to March 1966 Charles, Inc.'s management team was composed of Schneider, James Smyth (hereinafter Smyth), and Fred Ostrow. Schneider, Smyth and Ostrow were paid direct compensation of $13,113.68, $9,177.58 and $8,958.55 respectively for the year ended June 30, 1966. Jack Shurter (hereinafter Shurter), a C.P.A., was hired by Charles, Inc. on March 1, 1966, to work as treasurer and comptroller. Shurter signed a salary agreement covering March 1, 1966 through June 30, 1971, in which Charles, Inc. agreed to pay him an annual salary of $13,000 plus a bonus payable from net profits computed as follows: 19 (1) 3-1/2% bonus on the first $50,000.00 of said net profit. (2) 4% bonus on said net profit of the corporation which is in excess of $50,000.00, but not more than $100,000.00. (3) 4-1/2% bonus on said net profit of the corporation which is in excess of $100,000.00, but not more than $150,000.00.
(4) 5% bonus on said net profit of the corporation which *174 is in excess of $150,000.00, but not more than $200,000.00.
(5) 5-1/2% bonus on said net profit of the corporation which is in excess of $200,000.00, but not more than $250,000.00. (6) 6% bonus on said net profit of the corporation which is in excess of $250,000.00, but not more than $300,000.00. Shurter played an active role in the management team of Charles, Inc. until he resigned effective June 15, 1968.Under his salary agreement, Shurter received $17,482.22 and $22,008.91 for the years ended June 30, 1967 and June 30, 1968 respectively. Smyth, as vice-president of Charles, Inc., entered into a salary agreement with Charles, Inc. on July 1, 1966. For the period July 1, 1966 through June 30, 1971 Smyth was to receive an annual salary of $13,000 and a bonus computed in the same manner of Shurter. Schneider relied most heavily on Smyth and together they made Charles, Inc. a success. For the fiscal years ended June 30, 1967 and June 30, 1968, Smyth received $21,037.22 and $27,996.82 respectively. Ostrow also received a similar bonus. His total compensation for the years ended June 30, 1967 and June 30, 1968 was $18,672.38 and $23,971.82 respectively. Ostrow was a part of the *175 Charles, Inc. management team, but on a level below Schneider and Smyth. 20 Schneider did not have a bonus arrangement with Charles, Inc. He received direct compensation of $13,750 and $17,751.80 for the years ended June 30, 1967 and June 30, 1968 respectively. The following table shows pertinent figures from Charles, Inc.'s tax returns for the fiscal years ended June 30, 1964 through June 30, 1968 (rounded to nearest dollar): 21 Officers' Salaries -
Officers' Salaries -
Direct [4] *176 Direct [4]
Net
Year
Gross
Gross
Profit Charles
James
Jack
Ended
Receipts
Profit
Before
Schneider
Smyth
Shurter
Salaries
& Fed.
Inc. Tax
6-30-64
$379,138
73,708
$14,434
$13,260
6-30-65
706,048
152,798
14,415
13,901
6-30-66
1,140,053
274,483
59,844
13,114
6-30-67
1,748,328
494,377
193,308
13,750
$21,037
$ 17,482
6-30-68
2,294,183
731,025
282,763
17,752
27,997
22,009
Officers' Salaries -
Direct [4]
Year
Fred
Total
Ended
Ostrow
Officers'
6-30-64
$13,260
6-30-65
13,901
6-30-66
13,114
6-30-67
52,269
6-30-68
$23,972
91,729
Year
Taxable
Federal
Net Profit
Total
Earned
Ended
Income
Income
After
Assets
Surplus
Taxes
Officers'
Book
Year
Salaries
Value
End
& Fed.
Year
Inc. Tax
End
6-30-64
$ 1,174
$ 336
$ 838
$ 76,621
$ 838
6-30-65
514
None
514
100,960
1,352
6-30-66
46,730
16,828
29,902
208,505
31,254
6-30-67
141,038
62,657
78,381
316,356
109,634
6-30-68
191,034
89,433
101,601
479,154
210,660 22 Charles, Inc. had the following number of employees at the end of each of the following years: Year Ended
Numbers of Employees 6/30/64
63
6/30/65
53
6/30/66
71
6/30/67
77
6/30/68
111
The factory buildings occupied by C.S. & Co., Future Foam, and Charles, Inc. were leased from Cynthia Realty Co. (hereinafter Cynthia Realty), a company having Schneider as its president and sole stockholder. During 1966 Schneider, as president of Cynthia Realty, was involved in securing contractors for the construction of new factory buildings, and was thereafter paid a commission of $1,380. C.S. & Co.'s net income, expressed as a percentage of gross profit, for each of its years ended June 30, 1966, 1967, and 1968 was 4.33%, 8.56% and 11.54% respectively. Charles, Inc.'s net income, expressed as a percentage of gross profit, for each of its years ended June 30, 1966, 1967 and 1968 was 17.02%, 28.52% and 26.13% respectively. C.S. & Co. paid officers' compensation (including deferred compensation), expressed as a percentage of net income before federal income tax and before officers' salaries, as *177 follows: 23 Year Ended
Schneider
Summer
Others
Total 6/30/66
35,73%
40.75%
12.74%
89.21%
6/30/67
28.55
32.10
17.03
77.69
6/30/68
25.60
29.19
12.74
67.53
Future Foam paid officers' compensation (including deferred compensation), expressed as a percentage of net income before federal income tax and before officers' salaries as follows: Year Ended
Friedman
Grossman
Schneider
Total 6/30/66
30.12%
30.14%
17.04%
77.30%
6/30/67
25.31
25.35
36.46
87.12 Charles, Inc. paid officers' compensation (including deferred compensation), expressed as a percentage of net income before federal income tax and before officers' salaries, as follows: Year Ended
Schneider
Smyth
Shurter
Ostrow
Total 6/30/66
22.61%
22.61%
6/30/67
7.84
11.11%
9.15%
28.10
6/30/68
6.86
10.17
7.88
8,64%
33.55
During the years ended June 30, 1966, 1967, and 1968 (August 31, in the case of Future Foam) Schneider was paid direct and deferred compensation as follows: Direct
Deferred
Total Compensation C.S. & Co.
$65,104.94
$213.88
$65,318.82
Central
7,440.00
286.29
7,726.29
Future Foam
45,000.00
535.93
45,535.93
Charles, Inc.
13,113.68
541.64
13,665.32
$132,236.36 24 Direct
Deferred
Total Compensation C.S. & Co.
$59,052.98
$872.62
$59,925.60
Central
5,340.00
510.98
5,850.98
Future Foam
45,780.00
528.84
46,308.84
Charles, Inc.
13,750.00
1,626.29
15,376.29
$127,461.71
Direct
Deferred
Total Compensation C.S. & Co.
$65,000.00
$980.12
$65,980.12
Central
2,400.00
538.69
2,938.69
Future Foam
19,086.00
541.50
19,627.50
Charles, Inc.
17,751.80
1,979.35
19,731.15
$108,277.46
*178 During the years ended June 30, 1966, 1967 and 1968, Summer was paid direct and deferred compensation as follows: Direct
Deferred
Total Compensation C.S. & Co.
$74,414.50
$80.95
$74,495.45
Central
7,440.00
132.05
7,572.05
$82,067.50
Direct
Deferred
Total Compensation C.S. & Co.
$66,357.95
$1,013.11
$67,371.06
Central
5,340.00
272.78
$5,612.78
$72,983.84
Direct
Deferred
Total Compensation C.S. & Co.
$74,089.36
$1,165.00
$75,254.36
Central
2,400.00
302,75
2,702.75
$77,957.11
During the fiscal year ended August 31, 1966, Friedman was paid direct and deferred compensation as follows: 25 Direct
Deferred
Total Future Foam
$80,176.00
$290.39
$80,466.39
During the fiscal year ended August 31, 1966, Grassman was paid direct and deferred compensation as follows: Direct
Deferred
Total Future Foam
$80,176.00
$331.53
$80,507.53
The respondent disallowed the amounts of direct compensation paid by C.S. & Co. to Schneider and Summer during its fiscal years ended June 30, 1966 through 1968 in excess of $35,000 and $50,000 respectively. The respondent disallowed the amount of direct compensation paid by Central to Schneider during its fiscal year ended June 30, 1966, in excess of $5,200. The respondent disallowed the amounts of direct compensation *179 paid to Friedman and Grassman by Future Foam during the year ended August 31, 1966, in excess of $50,000 each. The respondent also disallowed the amounts of direct compensation paid to Schneider by Future Foam during its fiscal years ended August 31, 1966, and August 31, 1967 in excess of $35,000 a year. The respondent did not dispute the compensation paid to any employee of Charles, Inc. Prior to October 1, 1966, Future Foam had been selling foam products to Middle West Fabric Supply Co., Inc. a 26 Missouri corporation (hereinafter referred to as Middle West), which had its principal place of business in the Kansas City, Missouri area. In order to have a constant sales source in the Kansas City area, Future Foam felt it needed the services of Middle West as a distributor of its foam products. The minutes of the combined special meeting of the Board of Directors and Stockholders of Future Foam on October 15, 1966 stated the following: The chairman then stated that the primary purpose for holding this meeting was to discuss the investment by the corporation in 50% stock ownership of a Middle West Fabric & Supply Company, Inc., a Missouri corporation the office of which is located *180 in Kansas City, Missouri. There was a general discussion of the purpose for the acquisition of this stock as an investment. There were several good business purposes for the acquisition of this stock, and it was considered to be of mutual advantage both to Future Foam, Inc., and to the above named Missouri corporation for Future Foam, Inc. to acquire this stock. There was a review of the proposed agreement between the two above named corporations, as well as the stockholders agreement, and salary agreement between the above Missouri corporation and its President, Michael J. Levine. It was stressed that the acquisition of this stock by Future Foam, Inc. was not in any way to hinder its sale of products to other companies in the market area of the Missouri corporation, and that in general, each of the above corporations should deal with one another at "arms length" so far as buying, selling, or otherwise transacting business with one another. Effective October 1, 1966 Future Foam agreed with Middle West to purchase 30,000 newly issued shares of Middle West stock, which would then equal 50 percent of all the issued 27 and outstanding stock of Middle West for $30,000. The remaining *181 30,000 shares were owned by Michael J. Levine (hereinafter Levine), the president of Middle West. Upon acquisition of the Middle West stock, Friedman became Middle West's vice-president and secretary and also a member of its board of directors. Of the $30,000 capital contribution made by Future Foam, approximately $5,000 to $8,000 immediately went into the purchase of equipment necessary in processing foam. Upon its contribution Future Foam debited its investment account in the amount of $30,000. The amount was reflected on Future Foam's balance sheets under the category "Other Investments". Middle West continued to purchase foam from Future Foam on a regular basis. Middle West soon began to have difficulty in paying its debts to Future Foam. On October 1, 1967, Future Foam transferred the 30,000 shares of Middle West stock to Levine in exchange for a promissory note from Levine and his wife in the amount of $30,000, payable in monthly installments of $1,660. The first installment was not due until October 1, 1969. On November 6, 1967, Friedman resigned as vice-president, secretary and director of Middle West. 28 On May 28, 1968, Middle West informed Future Foam that due to *182 continuing losses in its operation, it was ceasing operations and would be unable to pay its accounts due Future Foam. Thereafter the $30,000 Middle West stock investment was written off as a "Bad debt from Investment". On November 12, 1968, Involuntary petitions in Bankruptcy were filed by Future Foam against Levine and his wife Barbara. On its return for the year ended August 31, 1968, Future Foam claimed a bad debt deduction of $64,995. The respondent disallowed this to the extent of $30,000 which the respondent claimed was a capital loss. Charles, Inc. filed a consolidated income tax return for its year ended June 30, 1968 with its wholly owned subsidiary, Chemical Corporation of America, Inc., which was organized on July 19, 1967. Future Foam, 100 percent owner of Charles, Inc. did not join in this consolidation. OPINION Section 162(a) provides that in computing its taxable income a corporation shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered". The first issue *183 29 we must decide is whether the amounts paid as compensation by C.S. & Co., Future Foam, and Central to their officers were reasonable within the meaning of section 162(a) (1).
The determination of the Commissioner is presumptively correct and the burden of proving the reasonableness of the compensation is upon the petitioners. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). This is a question of fact to be ascertained from all the facts and circumstances of the particular case. Anthony Mennuto, 56 T.C. 910 (1971); Boyle Fuel Co., 53 T.C. 162 (1969). As stated in Mayson Manufacturing Co. v. Commissioner, 178 F. 2d 115, 119 (C.A. 6, 1949), reversing a memorandum decision of this Court: Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations *184 with a limited number of officers the amount of compensation paid to the particular employee in previous years. Where the employees, to whom the salaries are paid, are in control of the corporate employer's affairs, such circumstances are subject to close scrutiny by the Court. Heil Beauty Supplies, Inc. v. Commissioner, 199 F. 2d 193 (C.A. 8, 1952), affirming a memorandum decision of this Court; Anthony Mennuto; supra. 30 With respect to petitioner C.S. & Co. the respondent has questioned the reasonableness of salaries paid to Schneider and Summer in excess of $35,000 and $50,000, respectively, for the fiscal years ended June 30, 1966, 1967 and 1968. Throughout the years in question, Schneider owned 100 percent of all outstanding C.S. & Co. stock. Summer, Schneider's brother-in-law, was president. On July 1, 1963, Schneider stepped down as president of C.S. & Co. to become president of the newly formed Charles, Inc. In this capacity, he devoted substantially less time to C.S. & Co. than before. He also held offices in Future Foam, Central and Cynthia Realty. Schneider's duties at C.S. & Co. became more advisory in nature and were directed primarily at creating an environment *185 where the new management team, headed by Summer, would become entirely "self-motivated". Because of Schneider's decrease in responsibilities and services rendered to C.S. & Co., we must weigh the part-time nature of his duties in determining the reasonableness of his salary. Ben Perlmutter, 44 TC. 382 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967), see Rota-Cone Oil Field Operating Co. v. Commissioner, 171 F. 2d 219 (C.A. 10, 1948, affirming a memorandum decision of this Court. In the years prior to 1963, Schneider as president of C.S. & Co. never made over $44,059. Yet in 1966, 1967 and 31 1968, when Schneider was a part-time advisor and C.S. & Co. had an almost independent management team, his salary rose to $65,105, $59,053 and $65,000, respectively. This was in addition to the salaries he was drawing from other related corporations. Schneider was admittedly a man of superior drive and qualifications. However, most of his innovations were already in use at C.S. & Co. and he had fewer responsibilities. See Harolds Club v. Commissioner, 340 F. 2d 861 (C.A. 9, 1965), affirming a memorandum decision of this Court. Deductions are allowable only to the extent that they represent *186 compensation for services rather than distributions of profits. Jefferson Block & Supply Co., 59 T.C. 625 (1973); Paula Construction Co., 58 T.C. 1055 (1972), on appeal (C.A. 5, Nov. 13, 1973). Summer, though president of C.S. & Co. during the years in issue, devoted a portion of his time to the management of Central. Thus we must consider his salary at C.S. & Co. in light of his other responsibilities. Summer was well qualified and expended a great deal of effort at C.S. & Co. Furthermore, though granted an option to purchase 20 percent of C.S. & Co. stock, he declined to do so. In reviewing the compensation of their bonus agreements with C.S. & Co. whereby all net profits are divided equally by Summer and Schneider 32 after setting aside 2 percent of net sales for retained earnings and amounts for state and federal taxes. Such contingent payments need close and careful consideration. Tumwater Lumber Mills Co. v. Commissioner, 65 F. 2d 675 (C.A. 9, 1933), affirming a memorandum decision of this Court. The following table shows the compensation paid by C.S. & Co. to Schneider and Summer during the years in issue (not including deferred compensation): Year Ended
Salary
Bonus #1
Bonus #2
Total 6/30/66
Schneider
$12,000.04
$4,876.84
$48,228.06
$65,104.94
Summer
19,305.00
4,876.84
50,232.66
74,414.50
6/30/67
Schneider 12,000.04
5,949.63
41,103.31
59,052.98
Summer
19,305.00
5,949.63
41,103.32
66,357.95
6/30/68
Schneider
12,000.04
8,367.19
44,632.77
65,000.00
Summer
19,305.00
8,367.19
46,417.17
74,089.36
The *187 effect of Bonus #2 appears to us to be a built-in mechanism for the distribution of profits and is apparently without relation to services performed. R. H. Oswald Co., Inc. v. Commissioner, 185 F. 2d 6 (C.A. 7, 1950), affirming a memorandum decision of this Court; Klamath Medical Service Bureau, 29 T.C. 339 (1957), affd. 261 F. 2d 842 (C.A. 9, 1958). C.S. & Co. indicates that the bonus agreement provided a 33 "high risk" incentive to Schneider and Summer. In view of Schneider's 100 percent ownership of stock we find that such incentive could have been of little value to him. Irby Construction Co. v. United States, 290 F. 2d 824 (Ct. Cl., 1961); City Chevrolet Co. v. Commissioner, 228 F. 2d 894 (C.A. 4, 1956), affirming a memorandum decision of this Court. Summer was related to Schneider. Other members of the post-1963 C.S. & Co. management team did not have similar bonus arrangements. Robert Conger, who Summer classified as a key man with great responsibility in the operations of C.S. & Co., was promoted to vice-president in 1966 and was paid $13,460, $21,350 and $28,690 during the fiscal years ended June 30, 1966, 1967 and 1968. This indicates to us that aside from Schneider *188 and Summer, C.S. & Co. did not feel that "high risk" incentives were necessary to secure the desired performance from management personnel. The respondent has not questioned the reasonableness of salaries paid by Charles, Inc. Schneider devoted the greatest portion of his time to the management of Charles, Inc. Its management team was made up of Schneider, president, James Smyth, vice-president, Jack Shurter treasurer, and Fred Ostrow, vice-president from 1968 forward. This management team did not have bonus arrangements similar to those given Schneider and Summer by C.S. & Co. Smyth, Shurter, and Ostrow did have 34 salary agreements which provided bonuses ranging from 3-1/2 percent to 6-1/2 percent of net profits in addition to a base salary. Smyth, the highest paid member of this management team, never made more than $28,000 during the years in issue. Furthermore, the percentages of net income which were paid as compensation for officers of Charles, Inc. were 22.61%, 28.10% and 33.55% for the fiacal years ended June 30, 1966, 1967 and 1968, respectively. By comparison, C.S. & Co. paid 89.21%, 77.69% and 67.53% of its net income to officers as compensation for services during *189 those same years. Because the two businesses were quite similar in operation, size, sales, and net profits during the years in issue, we can only attribute the wide discrepancy in compensation to a distribution of profits by C.S. & Co. in the guise of salaries. That some profits were distributed is further shown by a failure of C.S. & Co. to pay dividends, though a profitable corporation since its inception in 1954. The Barton-Gillet Co. v. Commissioner, 442 F. 2d 1343 (C.A. 4, 1971), affirming per curiam a memorandum decision of this Court; Charles McCandless Tile Service v. United States, 422 F. 2d 1336 (Ct. Cl., 1970). Where a corporation has a large capital investment, shareholders are entitled to a return on their contributions. Pacific Grains, Inc. v. Commissioner, 399 35 F. 2d 603 (C.A. 9, 1968), affirming a memorandum decision of this Court. We doubt seriously whether salary agreements such as those before us would be permitted by completely independent shareholders. Taking into account both sides of the coin, for example the obvious superior talents of Schneider and Summer yet the excessively high percentage of net income paid out in salaries, and admitting the uncertainties *190 in substituting our business judgment for that of others, we find that salaries paid by C.S. & Co. to Schneider and Summer, during each of its fiscal years 1966, 1967 and 1968, in excess of $40,000 and $60,000, respectively, to be unreasonable and hence not allowable as deductions. Future Foam during the years in issue was owned 60 percent by Schneider, 20 percent by Riedman and 20 percent by Grassman. Most of our reasoning for C.S. & Co. has applicability to Future Foam. Schneider was involved with several other corporations, primarily Charles, Inc. The part-time nature of his services lessen his overall value to the corporation. Moreover, Schneider, Friedman and Grassman had bonus agreements similar to the C.S. & Co. bonus previously discussed, providing the even division of net profits among the three officers after deleting 2 percent of net sales for retained earnings and amounts 36 covering state and federal taxes. This agreement resulted in 77.3 percent of net income (prior to deducting officers' compensation and state and federal taxes) being used to pay Schneider, Friedman, and Grassman. Schneider's salary was limited to a maximum of $45,000. However, excess 1966 bonus *191 of $24,606 was merely paid over to Schneider the following year. Future Foam has also never paid any dividends. Again, taking all factors into consideration, we find that the salaries paid Schneider by Future Foam during its fiscal years 1966 and 1967 in excess of $40,000 to be unreasonable in amount and hence nondeductible. With respect to Friedman and Grassman we find amounts paid out by Future Foam in fiscal year 1966 in excess of $65,000 to be excessive and hence unallowable as a deduction. Central was owned equally by Schneider and Summer. Summer, as president, devoted more time to the management of Central than Schneider during the fiscal year ended June 30, 1966. Schneider and Summer were paid identical sums of $7,440 during the year in issue.Central has never paid any dividends. The Commissioner determined that any salary given to Schneider in excess of $5,200 was unreasonable. In view of Schneider's unusual leadership ability we find nothing unreasonable about a salary to him of $7,440 and so hold. 37 In our holdings we have looked to many factors, some of which we have stated in our opinion, and others self-evident from our findings of fact. We have based our conclusion *192 on the the services rendered to each petitioner separately by the various employees involved. See Salem Packing Co., 56 T.C. 131 (1971). The second issue we must face is whether Future Foam is entitled to a deduction as a bad debt pursuant to section 166(a) or whether it has sustained a capital loss on the worthlessness of a note it acquired on the sale of stock it held in another corporation. In order to secure a reliable distributor of its foam products, Future Foam purchased 50 percent of the stock of Middle West at a cost of $30,000. After a relatively short period of time, Middle West had difficulty in paying its accounts due Future Foam. As a result of this undersirable situation, Future Foam sold its stock to Levine, the only other shareholder of Middle West, for its original cost of $30,000. The $30,000 was evidenced by a note between Levine and his wife and Future Foam. During the fiscal year ended August 31, 1968, prior to any payments by Levine, the note became totally worthless. Because we are convinced that the Middle West stock was purchased in the ordinary course of Future Foam's 38 business of manufacturing and selling foam, we would have had no doubt that it *193 would have been entitled to an ordinary loss deduction under section 165(a), had the loss occurred on the sale of the stock. Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955); Schlumberger Technology Corp. v. United States, 443 F. 2d 1115 (C.A. 5, 1971); Electrical Fittings Corp., 33 T.C. 1026 (1960). The fact that the petitioner, Future Foam, carried it on its books as an investment, or made reference to it as such, does not alter our conclusion. Corn Products Refining Co., supra; Tulane Hardwood Lumber Co., Inc., 24 T.C. 1146 (1955). However the loss occurred on the worthlessness of the note rather than on the sale of the stock. For this reason we are governed by the provisions of section 166. See Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). Section 166(a) (1) grants a deduction for any debt which becomes worthless within the taxable year. We hold that Future Foam is entitled to ordinary deduction pursuant to section 166(a) (1) on the worthlessness of Levine's note, especially in light of the ordinary nature of the entire transaction. Furthermore respondent's attempt to distinguish business vs. nonbusiness bad debts pursuant to section 166(d) is *194 completely erroneous since it specifically excludes corporate taxpayers from its operation. 39 The last issue we must decide is whether Charles, Inc. and its wholly owned subsidiary, Chemical Corp. of America were entitled to file a consolidated return without Future Foam, the parent of Charles, Inc.
Section 1501 provides that an affiliated group of corporations shall have the privilege of filing a consolidated return if all members of the affiliated group consent to all the consolidated regulations prescribed under section 1502. Section 1504 defines an "affiliated group" to mean "one or more chains of includible corporations connected through stock ownership with a common parent corporation", if certain 80 percent stock ownership requirements, not in issue herein, are met. Section 1.1502-76(b) (1) Income Tax Regs. provides that "The consolidated return of a group include the income of the common parent for that corporation's entire taxable year * * * and, except as provided in subparagraph (5) of this paragraph [not relevant herein], the income of each subsidiary for the portion of such taxable year during which it was a member of the group." The consolidated return regulations *195 are legislative in character and have the force and effect of law. Salem Packing Co., supra, at 144. Since the incorporation of Charles, Inc. on July 1, 1963, the entire outstanding capital stock of Charles, Inc. has been held by Future Foam. Chemical Corporation of 40 America, Inc. was the wholly owned subsidiary of Charles, Inc. It is therefore apparent to us that Charles, Inc. and Chemical Corporation of America were not privileged to file a consolidated return without having Future Foam, the common parent and a necessary corporation in the affiliated chain join in such consolidated return. The petitioners argue that Future Foam is not the parent of Charles, Inc. because beneficial title to 100 percent of the stock lies with Schneider. The only evidence we have supporting the petitioners' position is the salary agreements executed between Future Foam and Friedman and Grassman. In granting Friedman an option to purchase 20 percent of Future Foam's stock the agreement stated: There is presently issued and outstanding ten (10) shares of the common stock of the company, par value, $1,000.00, owned solely by Charles Schneider. The parties contemplate that an additional $18,000.00 *196 of common stock represented by one hundred eighty (180) shares of the capital stock of the company, shall be issued to Charles Schneider on or about September 1, 1963. It is also contemplated that Sol [Friedman ] shall have no interest in the stock investment to be made by Future Foam, Inc., in its wholly owned subsidiary, Chairs, Inc., [predecessor of Charles, Inc. ] but that the net stockholder's equity in such investment shall accrue to Charles Schneider. It is quite evident that Future Foam was a viable corporate entity with an existence apart from its shareholders. 41 Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); David F. Bolger, 59 T.C. 760 (1973), cf. William B. Howell, 57 T.C. 546 (1972). Furthermore, it has not been established to our satisfaction that Future Foam held the Charles, Inc. stock merely as an agent for Schneider. National Carbide Corporation v. Commissioner, 336 U.S. 422 (1949). Admittedly, Schneider would have practical control over Charles, Inc. However we do not think that this is sufficient to say that Future Foam has given up its right to vote the Charles, Inc. stock and carry out other functions incident to being a shareholder. Future *197 Foam was therefore a member of an affiliated group, including Charles, Inc. and Chemical Corporation of America. Since Future Foam did not join in filing a consolidated return with the other members of the group, the regulations have not been followed. Therefore we hold that the income, costs of goods sold, and various other expenses of Chemical Corporation of America may not be used by Charles, Inc. in determining its taxable income for the fiscal year ended June 30, 1968. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Future Foam, Inc., a Nebraska Corporation, docket No. 7741-70; Charles, Inc., an Iowa Corporation, docket Nos. 7743-70, 7744-70; Central Woodworking Co., Inc., an Iowa Corporation, docket No. 7745-70. ↩
3. On Future Foams returns for fiscal 1964 through 1968 officers' bonuses were deducted as part of cost of goods sold rather than as officers' compensation. The gross profit figures are prior to deduction of these bonuses and the bonuses are shown as part of officers' compensation. ↩
4. Only officers' salaries shown in the officers' compensation section of the tax return are reflected in the table.